# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DAWN L. BROWN,

                   Plaintiff,

         v.

COMMONWEALTH OF
PENNSYLVANIA, et al.,

              Defendants.

CIVIL ACTION NO. 1:14-CV-00201

(CONNER, C.J.)
(MEHALCHICK, M.J.)

## REPORT AND RECOMMENDATION

This is an employment discrimination civil rights action initiated by the filing of a counseled complaint in this matter by Plaintiff Dawn L. Brown on February 5, 2014. (Doc. 1). In her complaint, Brown asserts violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951, *et seq.*, against the Pennsylvania Department of Corrections ("DOC"), an agency of the Commonwealth of Pennsylvania, as well as PHRA violations against Sergeant Michael Harmon, Lieutenant Brian Hoerner, Captain Jonathan Hepner, and Captain James Meintel. (Doc. 1, ¶¶ 5-9). At all times relevant to this complaint, Brown and all individual Defendants were employed by the DOC as corrections officers ("COs") at SCI-Camp Hill in Cumberland County, Pennsylvania. (Doc. 1, ¶¶ 4-10). Now pending before this Court is a motion for summary judgment filed by all Defendants with the exception of Harmon. (Doc. 29). For the reasons provided herein, it is respectfully recommended that the motion for summary judgment be granted.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The DOC hired Brown as a CO and assigned her to SCI-Camp Hill in July of 2005. (Doc. 1, ¶ 10). The events that give rise to this complaint stem from an incident that occurred on or about October 30, 2009, in which Brown alleges that she was sexually harassed by Harmon, her supervisor. (Doc. 1, ¶ 11). Specifically, after Harmon complained about the length of time it took Brown to eat lunch and threatened to have her removed from security patrol, Brown called Harmon a "dirt bag" and told him to get over the fact that she would never sleep with him, to which Harmon responded that Brown had already "spread [her] p---y for all the[ ] others." (Doc. 30, ¶ 3; Doc. 30-1, at 5; Doc. 37-1, ¶ 3). Brown reported Harmon's comment later that day. (Doc. 1, ¶ 11; Doc. 30-1, at 5). The following month, Brown filed a complaint with the DOC's Equal Employment Opportunity ("EEO") office complaining of the incident and the DOC's lack of a response. (Doc. 1, ¶ 13; Doc. 30-1, at 27-30). After reviewing the incident, the DOC ultimately suspended Harmon for five days but chose not to reassign or transfer him. (Doc. 1, ¶ 12; Doc. 30, ¶ 4; Doc. 30-1, at 61-62; Doc. 37-1, ¶ 4).

Brown devotes the remainder of her complaint to describing a series of actions Defendants purportedly took in retaliation for her harassment charge against Harmon. On November 7, 2009, Brown was in an armed vehicle on the grounds of SCI-Camp Hill working security with Sergeant Murdoch while Harmon and another CO stood nearby looking at Brown in an intimidating manner. (Doc. 30, ¶ 28; Doc. 30-1, at 201-03; Doc. 37-1, ¶ 28; Doc. 37-5, ¶ 7). In response, Brown stated to Murdoch, allegedly in a joking manner, that it was silly of Harmon to try to intimidate her because she was the one with the weapon. (Doc. 30, ¶ 28; Doc. 30-1, at 202; Doc. 37-1, ¶ 28; Doc. 37-5, ¶¶ 7-10). The moving Defendants contend that Murdoch filed an incident report about Brown's comment a few days later. (Doc. 30, ¶ 30; Doc.

30-1, at 202, 611). Defendant Hepner conducted a review of the incident and ordered that Brown be placed on weapons restriction due to her comment.[1] (Doc. 1, ¶¶ 23-24; Doc. 30, ¶ 31; Doc. 30-1, at 611). A CO placed on weapons restriction is not allowed to work certain assignments, and therefore has fewer opportunities to collect overtime. (Doc. 30, ¶ 32; Doc. 37-1, ¶ 32). However, Brown neither alleges nor provides any evidence that she applied for specific overtime opportunities before she was placed on weapons restriction, while the restriction was in place, or even after the restriction was lifted. (Doc. 30, ¶ 33; Doc. 39, at 4).

After her comment to Murdoch, Brown took a leave of absence for several weeks. (Doc. 30, ¶ 36; Doc. 37-5, ¶ 13). When Brown returned to work in December of 2009, she was reassigned from security patrol to "N" block on the 6:00 a.m. to 2:00 p.m. shift, as COs are not required to carry weapons for block assignments but must do so for security patrol.[2] (Doc. 1, ¶ 23; Doc. 30, ¶¶ 5, 36-37; Doc. 37-1, ¶¶ 36-37). Brown was unhappy with her reassignment, even though she requested to be placed on the new shift to get away from Harmon, because she was no longer able to see her children off to school in the morning and because she was still

---

[1] Brown contests the authenticity of Murdoch's incident report, citing her friendship with Murdoch, the two-day delay in filing the incident report, and the fact that the report was not signed or otherwise authenticated by Murdoch. (Doc. 30-1, at 202, 611; Doc. 37, at 1; Doc. 37-1, ¶ 30). Brown instead alleges in her complaint that Hepner imposed the weapons restriction on Defendant Hoerner's recommendation, but she provides no evidence to support this allegation. (Doc. 1, ¶¶ 23-24). Notwithstanding the dispute over how this incident was brought to Hepner's attention, Brown admits that she made the comment about having access to weapons and that she was not suspended or otherwise formally disciplined for the incident aside from being placed on weapons restriction. (Doc. 30, ¶ 34; Doc. 37-1, ¶¶ 28, 34).

[2] The parties dispute whether block assignments are less desirable than security patrol, as COs on security patrol are outdoors and thus exposed to the elements but enjoy a significant amount of "down" time. (Doc. 1, ¶ 23; Doc. 30, ¶¶ 46-48; Doc. 37-1, ¶¶ 43, 46-48). Prior to her reassignment, Brown occasionally worked block assignments as needed when another CO was on sick leave. (Doc. 30, ¶ 43; Doc. 37-1, ¶ 43).

technically under Harmon's supervision.[3] (Doc. 1, ¶ 25; Doc. 30, ¶ 5; Doc. 30-1, at 348; Doc. 37-1, ¶ 5). Upon arriving for her first day of work on N block, Brown was subjected to a pat-down search by a male CO, which Brown alleges was in violation of DOC policy that pat-down searches must be conducted by a staff member of the same gender.[4] (Doc. 1, ¶ 21; Doc. 30, ¶ 38; Doc. 37-1, ¶ 39). Additionally, staff members searched the car that Brown drove to SCI-Camp Hill, though the moving Defendants point out that the DOC has the right to search any car on prison grounds without consent and that the car actually belonged to Brown's sister-in-law. (Doc. 1, ¶ 21; Doc. 30, ¶¶ 35, 38, 40; Doc. 37-1, ¶¶ 35, 38, 40). Brown appealed to Meintel to have her reassignment and weapons restriction overturned, but her request was allegedly denied "[i]n support of Sgt. Harmon . . . ." (Doc. 1, ¶¶ 26-27). Brown contends that the DOC's entire response to her comment to Murdoch—including the weapons restriction, shift reassignment, and searches—was an orchestrated effort to humiliate her in retaliation for filing the sexual harassment report against Harmon. (Doc. 1, ¶¶ 21-22). The moving Defendants, on the other hand, argue that the actions taken were a proportionate and reasonable response in light of Brown's comment. (Doc. 39, at 4).

Two days after her comment to Murdoch and just prior to taking leave, Brown was involved in another incident. (Doc. 1, ¶ 28; Doc. 30, ¶¶ 49-51; Doc. 30-1, at 65; Doc. 37-1, ¶¶ 49-51). At the beginning of her scheduled shift on the night of November 9, 2009, Brown

---

[3] Nonetheless, the moving Defendants contend that her reassignment to N block was one of the only feasible assignments available in light of the weapons restriction and conflicts she had with other COs. (Doc. 30, ¶¶ 44-45).

[4] The moving Defendants argue, however, that anyone is subject to a pat-down search at any time within the facility and that any policy about staff members of the same gender conducting searches only applies to inmates, not fellow employees. (Doc. 30, ¶ 39; Doc. 39, at 4).

refused to report to her assigned post, telling Hoerner that it was a hostile work environment and that she could not work with Harmon. (Doc. 1, ¶ 28; Doc. 30-1, at 65). Brown became increasingly agitated as Hoerner insisted that she had to report to her post, and allegedly referred to both Harmon and Hoerner as "motherf--ker[s]." (Doc. 1, ¶ 28; Doc. 30-1, at 65). Although Hepner eventually intervened and permitted Brown to go home, Hoerner proceeded to file an incident report against Brown. (Doc. 1, ¶ 28; Doc. 30-1, at 65). Hoerner recommended that Brown receive a written reprimand for abandoning her post, but ultimately any discipline against Brown was overturned on the basis that Brown never technically went to a post in the first place. (Doc. 1, ¶ 28; Doc. 30, ¶¶ 7, 49-51; Doc. 30-1, at 328; Doc. 37-1, ¶¶ 7, 49-51).

In addition to the two incidents described above that arose in November of 2009, Brown also continued to have problems with Harmon despite her transfer to a different shift. (Doc. 1, ¶¶ 16-17, 19). In her complaint, Brown alleges that Harmon tried to turn her fellow COs against her, at one point falsely telling an African-American co-worker that Brown had "called her a n----r." (Doc. 1, ¶¶ 16). On another occasion, in May of 2010, Harmon confronted Brown inside the dining hall and told her that she could not wear her Corrections Emergency Response Team ("CERT") jacket inside the institution. (Doc. 1, ¶ 18; Doc. 30, ¶¶ 18, 20; Doc. 30-1, at 553-61; Doc. 37-1, ¶¶ 18, 20; Doc. 37-5, ¶ 21). Harmon called over CO Garza, Brown's best friend, to witness the interaction and then admonished her not to wear the jacket in a normal tone of voice. (Doc. 30, ¶¶ 19, 22; Doc. 30-1, at 554-59; Doc. 37-1, ¶¶ 19, 22). Brown felt humiliated to be singled out and receive an order directly from her alleged harasser in front of her best friend. (Doc. 30, ¶ 22; Doc. 30-1, at 555-56; Doc. 37-1, ¶ 22). Furthermore, Brown felt that Harmon's order was unfair and incorrect because she had previously been told by Lieutenant Flowers that she could wear her CERT jacket while not on CERT duty, and because

other COs, including CO Saunders, were permitted to wear unauthorized military fleece jackets inside the institution. (Doc. 30, ¶¶ 21, 25; Doc. 30-1, at 558-59; Doc. 37-1, ¶¶ 21-25; Doc. 37-5, ¶¶ 22-24). Brown later received clarification from Hepner that COs were no longer permitted to wear CERT jackets when not on CERT duty, and she thereafter stopped wearing her CERT jacket at the institution. (Doc. 30, ¶¶ 23-24; Doc. 30-1, at 561-62; Doc. 37-1, ¶¶ 23-24). Neither Harmon nor Brown were disciplined for their dining hall interaction. (Doc. 1, ¶ 19).

Brown alleges that in addition to being prohibited from wearing her CERT jacket while other COs were allowed to wear unauthorized military fleeces, there were other occasions where similarly situated SCI-Camp Hill staff members who did not file discrimination complaints violated various rules but were not disciplined. (Doc. 1, ¶ 29; Doc. 37, at 3-4). For instance, Brown alleges that: CO Heredia bought drugs from an undercover police officer; CO Rattlesdorfer had a protection from abuse order ("PFA") taken out against him; CO Saunders was derelict in performing his duties, had a PFA taken out against him, and wore an unauthorized military fleece; CO Smith took prescription sleeping medication and drugs while on duty, which once caused him to crash his car while leaving SCI-Camp Hill; and CO Bock had hallucinations and had a mental disability. (Doc. 1, ¶ 29; Doc. 30, ¶¶ 52-57; Doc. 30-1, at 536, 541, 546, 548-53 ; Doc. 37-1, ¶¶ 52-57). Brown claims that none of these officers were reassigned, had their duties limited or cars searched, or otherwise faced any sort of adverse action. (Doc. 1, ¶ 29; Doc. 37, at 3-4).

On March 7, 2016, the moving Defendants filed the instant motion for summary judgment (Doc. 29), along with a brief in support thereof (Doc. 31), a statement of material facts (Doc. 30), and a series of exhibits (Doc. 30-1). On April 20, 2016, Brown filed a brief in opposition to the motion for summary judgment (Doc. 37), along with a response to the moving

Defendants' statement of facts (Doc. 37-1), and her own exhibits (Doc. 37-2; Doc. 37-3; Doc. 37-4; Doc. 37-5). The moving Defendants filed a reply brief on May 10, 2016. (Doc. 39). Having been fully briefed, this motion is now ripe for disposition.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a

showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.,* 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES,* 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony . . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment.").

## III.   DISCUSSION

The moving Defendants argue that they are entitled to summary judgment on Brown's Title VII and PHRA claims because Brown has not established a *prima facie* case of retaliation, or, in the alternative, because any adverse actions taken by these Defendants were reasonable and not motivated out of retaliatory animus. (Doc. 31, at 10-13). The Court addresses both causes of action together, because "in an action under Title VII and the PHRA, the standards under the federal and state statutes are the same." *Vernon v. A & L Motors,* 381 F. App'x 164, 167 n.5 (3d Cir. 2010) (not precedential) (citing *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 409 (3d Cir.

1999)) *see also Toth v. Cal. Univ. of Pa.*, 844 F. Supp. 2d 611, 626 (W.D. Pa. 2012) ("Although the PHRA is a statute of independent force under Pennsylvania law, its proscriptions have generally been construed to be coextensive with their federal counterparts."). However, the two statutes differ in that Title VII limits liability to "employers," whereas the PHRA imposes liability on "any person" found to violate the Act. *Compare* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."), *with* 43 Pa. Cons. Stat. § 955(b) (making it unlawful "for any person . . . to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."). Brown therefore asserts claims against the DOC under both Title VII and the PHRA, but only brings PHRA claims against the individual Defendants. (Doc. 1, ¶¶ 33, 39).

In the absence of direct evidence of retaliation, as is the case here, courts apply the familiar *McDonnell Douglas* burden-shifting framework to assess retaliation claims under Title VII and the PHRA. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192–93 (3d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate nondiscriminatory reason" for the alleged retaliatory action. *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant manages to rebut the plaintiff's *prima facie* case, the

burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for retaliation. *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

A.  Brown's *prima facie* case of retaliation

The moving Defendants contend that Brown's claims fail at the first step of the *McDonnell Douglas* analysis because she has not established a *prima facie* case of retaliation. (Doc. 31, at 10-13). A plaintiff establishes a *prima facie* case of retaliation by showing "that: (1) she engaged in activity protected by Title VII [and/or the PHRA]; (2) the [defendant] took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995). The parties do not dispute that Brown has satisfied the first element needed to establish a *prima facie* case of retaliation, as it is well settled that Brown's allegation of sexual harassment and subsequent filing of an EEO charge constitutes protected activity under Title VII and the PHRA. (Doc. 1, ¶ 13; Doc. 30, ¶ 4); *see also* 42 U.S.C. § 2000e-3(a); 43 Pa. Cons. Stat. § 955(b). The moving Defendants instead assert that Brown fails to establish the second and third elements needed to sustain a retaliation claim.[5] (Doc. 31, at 10).

1.  **Adverse employment action**

The moving Defendants first argue that none of the conduct alleged in Brown's complaint constitutes an adverse employment action. (Doc. 31, at 10-13). Adverse employment

_____

[5] In evaluating the merits of Brown's Title VII and PHRA retaliation claims, the Court may also consider First Amendment retaliation cases under 42 U.S.C. § 1983, as retaliation claims under all three statutes are subject to essentially the same analysis. *See Zappan v. Pennsylvania Bd. of Prob. & Parole,* 152 F. App'x 211, 217 (3d Cir. 2005) (non precedential).

actions include both conduct that affects the terms or conditions of employment and conduct that might "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "In evaluating whether actions are materially adverse, . . . 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" *Moore*, 461 F.3d at 346 (second alteration in original) (quoting *Burlington N.*, 548 U.S. at 68). Under this objective standard, the Court assesses each of the purported adverse employment actions that Brown has endured.

### a. Weapons restriction and reassignment

The Court turns first to the weapons restriction and reassignment ordered by Hepner after Brown remarked to Murdoch that Harmon should be afraid because she was the one with the weapon. The moving Defendants argue that these actions are not sufficiently adverse to satisfy the second prong of a retaliation claim because they did not affect Brown's employment. (Doc. 31, at 12). Although "reassignment of job duties is not automatically actionable," reassignment of a worker to a position with the same job description, but with less desirable duties, can constitute a materially adverse action. *Burlington N.*, 548 U.S. at 70-71 ("Common sense suggests that one good way to discourage an employee … from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."); *see also Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994) ("It is clear . . . that a transfer, even without loss of pay or benefits, may . . . constitute an adverse job action."). Brown asserts that her reassignment to N

block was a less desirable position because it was a more demanding assignment than security patrol and because it was located furthest away from the front gate of SCI-Camp Hill and therefore lengthened her daily commute, making it impossible for Brown to see her young children off to school in the morning. (Doc. 1, ¶ 25; Doc. 37-1, ¶¶ 5,43; Doc. 37-5, ¶ 16); *see also Burlington N.*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."). The moving Defendants dispute whether N block is a less desirable assignment than security patrol, citing the fact that COs on security patrol are outdoors and therefore exposed to the elements, but they do not contest the validity of Brown's reasoning for preferring her old assignment. (Doc. 30, ¶¶ 46-48). Indeed, the Court finds that the weapons restriction imposed on Brown could well deter a reasonable CO from reporting discrimination, given the loss of prestige and humiliation associated with this particular penalty. *See Moore*, 461 F.3d at 346 (holding that plaintiff sufficiently pleaded an adverse action in retaliation claim where plaintiff who made casual comment that supervisor "should be shot" was placed on weapons restriction and subject to other discipline, which a reasonable person could find to be an inappropriately severe response); *see also Montgomery v. Chertoff*, No. 03 CV 5387 ENV JMA, 2007 WL 1233551, at *18 (E.D.N.Y. Apr. 25, 2007) (noting that a United States Department of Homeland Security customs enforcement officer's loss of the ability to carry a firearm at work "goes to the heart of plaintiff's job responsibilities" and thus constituted a *de facto* demotion). Accordingly, viewing the facts in the light most favorable to Brown, the weapons restriction and

reassignment ordered by Hepner constitute adverse employment action sufficient to satisfy the second element of Brown's *prima facie* claim of retaliation.[6]

In addition to Hepner, Brown also attempts to implicate Hoerner and Meintel in the decision to place her on weapons restriction and reassign her to N block. (Doc. 1, ¶¶ 23-24, 26-27). Specifically, Brown claims in her complaint that Hoerner recommended the weapons restriction and reassignment that Hepner ultimately imposed, and that Meintel denied Brown's request to have the weapons restriction and reassignment overturned. (Doc. 1, ¶¶ 23-24, 26-27). However, Brown has failed to provide any evidentiary support for either of these allegations. "An individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . ." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Here, Brown has not carried her burden of providing specific allegations, backed up by evidence, that either Hoerner or Meintel participated in, or knew of and acquiesced to, the

---

[6] Brown also points out via deposition testimony that the weapons restriction limited her opportunities to earn overtime, as her primary overtime opportunity consisted of early morning hospital trips, an assignment that required COs to carry weapons. (Doc. 37-1, ¶¶ 32-33; Doc. 37-4, at 4). Though the moving Defendants note that Brown fails to allege that she ever actually applied for overtime either before or after she was placed on weapons restriction, they point to no caselaw within this Circuit in support of their proposition that a plaintiff must affirmatively plead that he or she specifically requested overtime in order to establish that the loss of overtime opportunities constitutes an adverse employment action. (Doc. 30, ¶ 33; Doc. 39, at 4). Additionally, as noted above, economic loss is not a prerequisite to establishing adverse employment action. *See Torre*, 42 F.3d at 831 n.7. Because the Court has already found that Brown's weapons restriction and reassignment constitutes a sufficiently adverse employment action, the Court need not determine whether Brown's reduced opportunities to earn overtime alone would have been sufficient to satisfy the "adverse action" standard in the absence of any evidence that she actually requested overtime assignments.

weapons restriction and reassignment. Moreover, with respect to Brown's allegation that Meintel denied her request to overturn the weapons restriction and reassignment, "a failure to act on a complaint is not a retaliatory or adverse action." *Monn v. Gettysburg Area Sch. Dist.*, No. 1:12-CV-2085, 2013 WL 1345501, at *4 (M.D. Pa. Apr. 2, 2013), *aff'd*, 553 F. App'x 120 (3d Cir. 2014) (not precedential); *see also Alexander v. Forr*, No. CIVA 3:CV-04-0370, 2006 WL 2796412, at *3 n.4 (M.D. Pa. Sept. 27, 2006) (Vanaskie, J.) ("It is doubtful that rejection or denial of a grievance constitutes the kind of adverse action that would deter a person of ordinary firmness from exercising constitutional rights."), *aff'd*, 297 F. App'x 102 (3d Cir. 2008) (not precedential). Thus, even if Brown could produce evidence that Meintel denied her request to have the weapons restriction and reassignment overturned, the underlying basis for Meintel's liability fails as a matter of law.

Accordingly, the Court finds that Brown has produced sufficient evidence to show that Hepner took adverse action against her in the form of the weapons restriction and reassignment that was sufficient to deter a reasonable employee from making a charge of discrimination. *See Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). However, there is no evidence to support a finding that Hoerner and Meintel also participated in this adverse employment action.

b. Searches of Brown's car and person

Upon returning from her leave of absence to assumer her new assignment on N block, Brown alleges that she was subjected to a pat-down search by a male CO and that other staff members searched her car. (Doc. 1, ¶¶ 21-22; Doc. 37-1, ¶¶ 35, 38, 39, 40). To the extent that Brown alleges that these searches constitute a separate adverse employment action, her argument fails. As a preliminary matter, Brown does not allege that any of the named Defendants either ordered or took part in the searches. (Doc. 37-5, ¶ 11 (claiming that the pat-

down search was conducted by an unnamed male CO)). Therefore, even if the pat-down search and search of her car constituted adverse employment action, Brown has failed to establish the personal involvement of any Defendants in this alleged wrongdoing. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Furthermore, in the event that Brown had sufficiently pleaded Defendants' personal involvement in the searches of her car and person, the Court finds that her allegations would not support a retaliation claim because the searches were not a materially adverse employment action. *See, e.g.*, *Wheeler v. Pennsylvania Dep't of Corr.*, No. CIV.A 07-323, 2009 WL 1653555, at *8 (W.D. Pa. June 11, 2009) (holding that DOC defendants did not take adverse employment action where plaintiff CO who was subjected to a pat-down search, a K-9 search of his car, and drug residue screening). Given that these searches are only alleged to have occurred once, on the day Brown returned from her leave of absence, this Court finds that the pat-down search and search of Brown's car are insufficient to deter a reasonable employee from making a charge of discrimination.[7]

### c.   Written reprimand by Hoerner

Brown next alleges that Hoerner issued an order for Brown to be issued a retaliatory written reprimand after she refused to report to her assigned post and engaged in a heated exchange with Hoerner and on the night of November 9, 2009. (Doc. 1, ¶ 28; Doc. 30-1, at 65).

---

[7] The moving Defendants additionally argue that the Court should not consider the pat-down search as potential evidence of retaliation because it was not mentioned in Brown's EEOC complaint. (Doc. 31, at 13 n.1 (citing Doc. 30-1, at 7)). Although Brown's failure to raise this specific allegation of discrimination in her EEOC complaint may be grounds to deny this argument for nonexhaustion of administrative remedies, a district court properly considers a new allegation not previously raised before the EEOC if it "can reasonably be expected to grow out of the initial charge . . . ." *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398–99 (3d Cir. 1976). It appears that the pat-down search could be seen as arising out of Brown's initial EEOC charge, but nonetheless the Court need not make this determination because the searches of Brown's car and person do not rise to the level of adverse employment action.

However, Brown concedes that she never received the written reprimand or was otherwise punished for this incident. (Doc. 30, ¶¶ 7, 49-51; Doc. 30-1, at 598-99; Doc. 37-1, ¶¶ 7, 49-51). It is well settled that "minor or trivial actions that merely make an employee 'unhappy' are not sufficient to qualify as retaliation . . . ." *Mondzelewski v. Pathmark Stores, Inc.,* 162 F.3d 778, 787 (3d Cir. 1998). Several courts within this Circuit have found that the issuance of a written reprimand, without the imposition of formal discipline, does not satisfy the "adverse employment action" element required to state a *prima facie* claim of retaliation. *See Allen v. Nat'l R.R. Passenger Corp.*, No. CIV.A. 03-CV-3497, 2005 WL 2179009, at *11 n.16 (E.D. Pa. Sept. 6, 2005)* ("Because [plaintiff] has failed to argue, let alone demonstrate, how the written reprimands and the investigation altered the terms of his employment, neither incident constitutes an adverse employment action."), *aff'd sub nom., Allen v. Nat'l R.R. Passenger Corp. (Amtrak)*, 228 F. App'x 144 (3d Cir. 2007) (not precedential); *see also Shesko v. City of Coatesville*, 292 F. Supp. 2d 719, 727 (E.D. Pa. 2003) (finding that no "adverse employment action" occurred where plaintiff was issued a written reprimand but did not receive formal discipline). In the case at bar, Brown never even received the written reprimand that Hoerner vowed to issue her, let alone any type of substantive punishment. (Doc. 30, ¶¶ 7, 49-51; Doc. 30-1, at 598-99; Doc. 37-1, ¶¶ 7, 49-51). Given these facts, the Court finds that Brown's confrontation with Hoerner does not rise to the level of an adverse employment action.

d.   Dining hall confrontation with Harmon

Brown's final allegation of retaliation is that in May of 2010, Harmon confronted Brown inside the dining hall in front of her best friend and told Brown that she could no longer wear her CERT jacket inside SCI-Camp Hill. (Doc. 1, ¶¶ 18-20; Doc. 30, ¶¶ 17-25; Doc. 30-1, at 553-61; Doc. 37-1, ¶¶ 17-25; Doc. 37-5, ¶¶ 21-24). Although Brown alleged in her complaint that

Harmon "berate[d] her," she later conceded that he spoke in a normal tone of voice and she was simply bothered to receive a direct order from her alleged harasser, particularly because other COs regularly wore unauthorized military fleece jackets inside the institution. (Doc. 30, ¶¶ 17-25; Doc. 30-1, at 553-61; Doc. 37-1, ¶¶ 17-25; Doc. 37-5, ¶¶ 21-24). Sometime after this incident, Hepner informed Brown that COs were no longer permitted to wear CERT jackets inside SCI-Camp Hill unless they were on CERT duty. (Doc. 30, ¶¶ 23-24; Doc. 30-1, at 561-62; Doc. 37-1, ¶¶ 23-24). The moving Defendants argue that even if these allegations are true, they do not constitute an adverse employment action and only implicate Harmon, who is not a party to the instant summary judgment motion. (Doc. 39, at 2-3).

This Court agrees with the moving Defendants that Brown's allegations in regard to the dining hall incident and CERT jacket policy do not amount to an adverse employment action. Brown's interaction with Harmon in the dining hall, although undoubtedly unpleasant, was not sufficient to satisfy the second element of a *prima facie* claim of retaliation. *See Sconfienza v. Verizon Pa. Inc.,* 307 F. App'x 619, 622, 624 (3d Cir. 2008) (not precedential) (finding that "harsh words that lack real consequences are not" enough to show an adverse action); *Nolan v. Swartz Campbell, LLC,* No. 2:05-CV-1508, 2008 WL 598291, at *20 (W.D. Pa. Feb. 29, 2008) ("[M]erely experiencing some apprehension and subjectively feeling intimidated from . . . a conversation hardly amounts to the type [of] measures that the courts have found sufficient to support a claim of retaliation."). Moreover, to the extent that Hepner may be responsible for any change in policy or enforcement of the existing policy regarding CERT jackets, Brown's inability to wear her CERT jacket while not on duty is the sort of trivial affront that does not give rise to a retaliation claim. *See Mondzelewski,* 162 F.3d at 787. Indeed, a reasonable employee would not be deterred from pursuing a charge of discrimination merely because she

could not wear her preferred jacket inside the workplace. *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006).

In conclusion, the Court finds that Hepner took adverse employment action against Brown by placing her on weapons restriction and reassigning her to N block. However, Brown's other alleged bases of retaliatory conduct do not rise to the level of adverse employment action. It is therefore respectfully recommended that Hoerner and Meintel be granted summary judgment because there are no facts upon which a reasonable jury could conclude that either of these two Defendants were personally involved in taking adverse employment action against Brown.

### 2. Causation

The third and final element that Brown needs to establish her *prima facie* case of retaliation is a causal connection between her EEO complaint against Harmon and Hepner's decision to place her on weapons restriction and reassign her to N block. *See Moore*, 461 F.3d at 346 ("[W]e must identify what materially adverse actions a reasonable jury could link to a retaliatory animus for each individual officer." (quotation omitted)). A causation analysis often, but not exclusively, rests on two key factors: "(1) the temporal proximity between the protected activity and the alleged retaliation and (2) the existence of any pattern of antagonism in the intervening period." *Jensen v. Potter,* 435 F.3d 444, 450 (3d Cir. 2006) (internal quotations omitted). "The Court measures temporal proximity from the date on which the litigant engaged in his first protect[ed] action." *Gairloch v. Pennsylvania State Univ.*, 84 F. Supp. 3d 407, 418 (M.D. Pa. 2015). "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Jensen,* 435 F.3d at 450 (quoting

*Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503-04 (3d Cir. 1997)). In the absence of unusually suggestive temporal proximity or a pattern of antagonism, courts "consider all of the proffered evidence as a whole to determine whether it may suffice to raise the inference" of causation. *Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 367 (W.D. Pa. 2012) (quotation omitted); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference."). Regardless of the evidence a plaintiff relies on to establish causation, however, a plaintiff must also satisfy an initial gateway requirement by establishing that the defendant knew of the plaintiff's protected activity. *See Ambrose v. Township of Robinson, Pa.,* 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

In the case at bar, Brown first reported that she had been sexually harassed on October 30, 2009, the day the alleged harassment occurred. (Doc. 1, ¶ 11; Doc. 30, ¶ 3; Doc. 30-1, at 5; Doc. 37-1, ¶ 3). That report was sent to and reviewed by Hepner hours after the alleged harassment, thereby establishing that Hepner knew of Brown's protected activity. (Doc. 30-1, at 5). On November 7, 2009, Brown made her comment to Murdoch that Harmon should not be trying to intimidate her because she was the one with a weapon. (Doc. 30, ¶ 28; Doc. 30-1, at 201-03; Doc. 37-1, ¶ 28; Doc. 37-5, ¶¶ 7-10). On November 10, 2009, eleven days after the alleged sexual harassment, Hepner learned of Brown's comment to Murdoch about having a weapon and immediately imposed the weapons restriction, which resulted in Brown's reassignment. (Doc. 1, ¶¶ 23-24; Doc. 30, ¶¶ 30-31; Doc. 30-1, at 611).

The eleven-day period between Brown's initial report of harassment and the adverse employment action is just beyond the length of time that is generally held to be unusually suggestive of temporal proximity. *See Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) (not precedential) ("We have found that a temporal proximity of two days is unusually suggestive of causation, but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive." (citations omitted)); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding temporal proximity not unduly suggestive where three weeks elapsed between protected activity and adverse employment action); *Kier v. F. Lackland & Sons, LLC,* No. CIV.A. 14–897, 2014 WL 7192403, at *17 (E.D. Pa. Dec. 17, 2014) ("Absent some intervening antagonism, Plaintiff cannot rest solely on a temporal proximity of more than one week."); *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014) ("[S]ix days is at the long end of what has been held to be unusually suggestive . . . ."). Nonetheless, the relatively strong inference of temporal proximity weighs in favor of a finding of causation. *See Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) ("Where the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.'" (quotation omitted)); *see also Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir. 2003) ("The amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation."). Here, there is sufficient other evidence in the record to infer causation from the intervening period between Brown's first report of sexual harassment and Hepner's decision to impose the weapons restriction on her. For instance, although Brown's heated exchange with Hoerner on November 9, 2009 and Hoerner's subsequent promise to issue Brown a written reprimand is insufficient to constitute an adverse

employment action *ipso facto*, this incident nevertheless evinces antagonism towards Brown by the other COs at SCI-Camp Hill during the intervening period after she first reported Harmon's alleged sexual harassment, particularly in light of the fact that the discipline Brown was issued as a result of this incident was ultimately overturned. (Doc. 1, ¶ 28; Doc. 30, ¶¶ 49-51; Doc. 30-1, at 65, 328, 598-99; Doc. 37-1, ¶¶ 49-51). Additionally, while Brown first accused Harmon of sexual assault in an October 30, 2009 employee incident report, she did not file her formal EEO discrimination complaint until November 10, 2009, the same day that Hepner imposed the weapons restriction. (Doc. 1, ¶ 13; Doc. 30-1, at 5, 27-30; Doc. 37-1, ¶ 3). In her EEO complaint, Brown even alluded to the incident on November 7 for which she would later be placed on weapons restriction, bemoaning the fact that she encountered Harmon despite Hepner's assurances that he would keep the two of them separated. (Doc. 30-1, at 29). This circumstantial evidence, combined with the relative temporal proximity between Brown's initial protected activity and the adverse employment action, is sufficient to establish the necessary inference of causation.

Accordingly, the Court finds that Brown has made out a *prima facie* claim of retaliation against Hepner. As noted above, however, Brown's claims against Hoerner and Meintel fail for lack of evidence that either of these two Defendants were personally involved in any conduct that rises to the level of adverse employment action against Brown.

B. NONRETALIATORY REASON FOR THE ADVERSE EMPLOYMENT ACTION

Because Brown has established a *prima facie* case of retaliation, the burden now shifts to the remaining Defendants to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). This burden is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the

adverse employment action; the defendant need not prove that the articulated reason actually motivated the action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997) (internal quotations omitted). Thus, "[t]he proffered reason need only raise a genuine issue of fact as to whether the employer acted impermissibly." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

Here, the moving Defendants have articulated a nonretaliatory reason for Brown's weapons ban and reassignment; namely, that Hepner's actions were a reasonable response to the potential threat of violence posed by Brown intimating that Harmon should be worried because she had weapons. (Doc. 30, ¶¶ 28-31; Doc. 30-1, at 387-89; Doc. 31, at 12-13). Brown admits that she made a comment to this effect, and instead merely contends that it should have been obvious that she was joking. (Doc. 30-1, at 202, 581-82; Doc. 37-5, ¶¶ 7-9). Hepner's stated reason for imposing the weapons ban—that he took Brown at her word and acted accordingly to protect the safety of SCI-Camp Hill and its staff from a potential violent incident—satisfies the "relatively light" burden needed to shift the onus back to Brown and proceed to the final step of the *McDonnell Douglas* analysis. *See Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 337–38 (E.D. Pa. 2015).

C. PRETEXT

Because Hepner has articulated a legitimate, nonretaliatory reason for Brown's weapons restriction and reassignment, the burden shifts to Brown once more show that Hepner's "proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse,* 126 F.3d at 501. In order to survive summary judgment at this stage, a plaintiff must produce "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). A plaintiff accomplishes this "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Krouse*, 126 F.3d at 504 (quoting *Fuentes,* 32 F.3d at 765). Alternatively, a plaintiff may show that discrimination was more likely than not a motivating or determining cause of the adverse employment action by "point[ing] to evidence with sufficient probative force for a factfinder to make this conclusion," such as the defendant's previous discrimination against the plaintiff, the defendant's previous discrimination against other employees within the plaintiff's protected class, or that the defendant previously treated more favorably similarly situated persons to the plaintiff who are outside of the protected class. *Capps*, 147 F. Supp. 3d 327 at 338 (quoting *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 556 (3d Cir. 2009) (not precedential)).

Here, Brown fails to marshal any evidence that could lead a reasonable juror to conclude that Hepner's stated reason for imposing the weapons restriction and reassigning Brown to N block was mere pretext. Brown relies on the contention that Hepner's stated safety considerations behind the decision to impose the weapons restriction are pretext because other COs who did not engage in protected activities "violated work Rules, but . . . were not disciplined." (Doc. 1, ¶ 29; Doc. 30, ¶¶ 52-57; Doc. 37, at 3-4; Doc. 37-1, ¶¶ 52-57). Moreover, Brown claims that it is a question of fact for the jury to decide whether these other COs are similarly situated. (Doc. 37, at 4). As a preliminary matter, the Court notes that although "[t]he question of whether other employees are 'similarly situated' is fact-intensive, . . . it is a question of law." *Jackson v. PNC Bank*, No. CV 15-230, 2016 WL 7324595, at *6 (W.D. Pa.

Dec. 16, 2016) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)). In determining whether other employees are similarly situated, the Third Circuit instructs courts to "focus . . . on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers,* 142 F.3d 639, 647 (3d Cir. 1998).

Hepner identified the potential threat of violence raised by Brown's comment about having weapons as the reason for her weapons ban and reassignment. (Doc. 30, ¶¶ 28-31; Doc. 30-1, at 387-89; Doc. 31, at 12-13). In applying the Third Circuit's directive to the case at bar, the Court notes that of the five COs named by Brown who allegedly violated DOC rules, only the allegations concerning Rattlesdorfer and Saunders potentially involve the threat of violence. (Doc. 1, ¶ 29; Doc. 30, ¶¶ 52-57; Doc. 37-1, ¶¶ 52-57). Specifically, Brown alleges that Rattlesdorfer and Saunders had PFAs taken out against them by an ex-girlfriend and wife, respectively. (Doc. 30, ¶¶ 54-55; Doc. 30-1, at 541-48; Doc. 37-1, ¶¶ 54-55). However, a review of the record indicates no basis to conclude that either Rattlesdorfer or Saunders were similarly situated to Brown but treated differently. Brown freely admits in her own deposition that Rattlesdorfer *was* placed on weapons restriction because of the PFA. (Doc. 30-1, at 541). Moreover, even though Brown alleges that Rattlesdorfer was not reassigned in light of the PFA, this distinction is immaterial because Brown notes that Rattlesdorfer already had a block assignment, meaning that his position did not require Rattlesdorfer to carry weapons. (Doc. 1, ¶ 29; Doc. 30-1, at 541). As for Saunders, Brown fails to allege whether Saunders was placed on weapons restriction after the PFA was taken out against him, let alone whether Saunders had been assigned to a post that required carrying weapons. (Doc. 30-1, at 541). The situation surrounding Saunders is also readily distinguishable from the circumstances of Brown's own case because the PFA against Saunders arose from a domestic dispute and therefore did not

pose a threat to SCI-Camp Hill or any of its staff. (Doc. 30-1, at 548). In short, Brown fails to establish that Rattlesdorfer was similarly situated to her but treated better, and her bare allegations concerning Saunders are also insufficient to cast doubt on Hepner's proffered reason for imposing the weapons restriction and reassignment. Brown points to nothing else in the record to suggest "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions [that would make Hepner's reason] unworthy of credence." *Krouse*, 126 F.3d at 504 (quoting *Fuentes,* 32 F.3d at 765).

Because Brown identifies no basis in the record for a reasonable fact finder to conclude that Hepner's nondiscriminatory reason for the adverse employment action is a pretext for retaliation, it is respectfully recommended that summary judgment be granted in favor of Hepner on Brown's retaliation claim.

### D. DOC LIABILITY

As a final matter, the Court writes separately to briefly address the liability of the DOC. Under Title VII, an employer may be liable to a plaintiff-employee for the retaliatory adverse employment actions of the employee's superior. *See Alers v. City of Phila.*, 919 F. Supp. 2d 528, 547 (E.D. Pa. 2013).In regard to her retaliation claims, Brown provides no separate allegations concerning the DOC and instead merely appears to invoke liability under the theory of respondeat superior. Here, because the Court finds that Hoerner, Meintel, and Hepner are all entitled to summary judgment on Brown's PHRA retaliation claims, the Court also finds no basis for Brown to maintain her retaliation claim against the DOC. However, Brown's underlying discrimination claim against Harmon remains, as Harmon is not a party to the instant summary judgment motion. To the extent that Brown alleges a hostile work environment claim against the DOC in addition to her claim of retaliation, she must establish

that: "(1) [she] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990). Although Brown accuses Harmon of sexually harassing her on October 30, 2009, at no point in her complaint does Brown allege that the sexual harassment was severe and pervasive. (Doc. 1). Given the absence of such an allegation, Brown cannot sustain a claim against the DOC for a hostile work environment. Accordingly, the Court recommends that the DOC be granted summary judgment and dismissed from this case.

IV.   **RECOMMENDATION**

Based on the foregoing, it is recommended that:

1. Defendants Hepner , Hoerner, Meintel, and the DOC's motion for summary judgment (Doc. 29) be **GRANTED**;

2. Defendants Hepner, Hoerner, Meintel, and the DOC be **DISMISSED** as parties to this action and terminated from the caption of the complaint; and

3. The case be remanded to the undersigned for further proceedings with respect to the remaining Defendant in this action.

**BY THE COURT:**

Dated: January 30, 2017                     s/ *Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DAWN L. BROWN,

                Plaintiff,

    v.

COMMONWEALTH OF
PENNSYLVANIA, et al.,

                Defendants.

CIVIL ACTION NO. 1:14-CV-00201

(CONNER, J.)
(MEHALCHICK, M.J.)

### NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **January 30, 2017**.

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: January 30, 2017**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**